# EXHIBIT 5

Item 4.1 – Chain of Title

## CHAIN OF TITLE FOR ARROWHEAD WATER RIGHTS AND SUP

### INTRODUCTION

In a letter from Christine Hill, District Ranger (the "Letter"), the United States Forest Service ("USFS") requested that Nestle Waters North America Inc. ("NWNA") provide "contract or other title documents that demonstrate a chain of title from the water rights assigned to California Consolidated Water Company, as described in ordering paragraph (b) (page 10) of the 1931 *Del Rosa* judgment, to ownership of those rights by [NWNA]" (Attachment to Letter at p. 2).

As set forth below, NWNA is the legal and valid successor-in-interest to the Arrowhead Water Rights and to NWNA's Special Use Permit #7285 (the "SUP"). Therefore, under long-standing and uncontroverted California, Delaware, and Federal legal precedent, NWNA owns the Arrowhead Water Rights and is entitled to exercise all rights, powers, and privileges associated with the SUP.

### DISCUSSION

**I.  WATER RIGHTS MAY BE TRANSFERRED TO SUCCESSORS BY DEED OR BY MERGER.**

**A.  Transfer of Water Rights to Successor Company by Deed.**

Water rights are characterized as real property interests, and as such are freely transferrable from one party to another. *Stepp v. Williams*, 52 Cal.App. 237, 253 (1921); *North Kern Water Storage Dist. v. Kern Delta Water Dist.*, 147 Cal.App.4th 555, 559 (2007). No special instrument is required to transfer water rights in California. Water rights may be transferred by a written conveyance, such as by deed (*see* CAL. CIV. CODE § 1091; *Stepp* at 253). To the extent, therefore, that any of NWNA's predecessor companies transferred water rights by deed (such as by grant deed or quitclaim deed), the successor company became the new owner of such water rights with the same rights and privileges as the transferor.

**B.  Transfer of Water Rights by Corporate Merger.**

A merger is a common corporate transaction where one or more corporations are combined into a new entity. The corporation laws of the company's state of incorporation generally govern the details and consequences of the merger (*Brunswick Corp. v. St. Paul Fire & Marine Ins. Co.*, 509 F.Supp. 750, 751 (E.D. Pa. 1981)). Water rights, like other property rights, held by a company are automatically transferred when the company merges into a new company (*see* CAL. CIV. CODE § 1039). Under the General Corporation Laws of both California and Delaware, upon a merger of two corporations, the surviving corporation automatically succeeds to the property of the merged corporation(s). No additional conveyance is legally required (*see*, *e.g.*, CAL. CIV. CODE § 1039; CAL. CORP. CODE § 1107(a)).

Therefore, if the merging companies were incorporated under California law, the rules in California would apply. Under California law, the surviving corporation in a merger automatically acquires the property of the merged corporation. "[T]he surviving corporation shall succeed, ***without other transfer***, to all the. . . property of each of the disappearing

corporations" (CAL. CORP. CODE § 1107(a) (emphasis added); *see also Maudlin v. Pacific Decision Sciences Corp.*, 137 Cal.App.4th 1001, 1016 (2006) (quoting Section 1107(a) in full)).

Similarly, if the merging companies were incorporated under Delaware law, the rules in Delaware would apply. Under Delaware law, the surviving corporation in a merger automatically acquires the property of the merged corporation. "[A]ll property, real, personal and mixed . . . of said [merged] corporations . . . shall be vested in the corporation surviving" (DEL. CORP. CODE § 259(a)).

The federal courts, applying Delaware law, have held that where a corporation merged with a company that had the right to divert surface water, the surviving company was the owner of that right as a matter of law. In holding that the surviving corporation in a merger automatically succeeded to the right of the merged corporation to draw surface water from the Delaware River Basin, the court observed that a "statutory merger . . . results in a combination of the two corporations with the surviving corporation attaining the property, rights, and privileges of the absorbed corporation. . . ." *(Texaco Ref. & Mktg., Inc. v. Delaware River Basin Comm'n*, 824 F.Supp. 500 (D. Del. 1993), *aff'd*, 30 F.3d 1488 (3d Cir. 1994).). Thus, "property" that may be acquired by a surviving corporation in a merger includes water rights.

The proposition that the rights and property of a merged corporation automatically transfer to the surviving corporation is without question and is a fundamental aspect of corporate law. The leading treatise on Delaware corporate law, *Folk on the Delaware General Corporation Law*, states the rule categorically: "In a merger . . . all rights of the constituent corporation are transferred to the surviving corporation by operation of law" (*Folk on the Delaware General Corporation Law* § 259.02 (6th ed. 2016)). *Folk* also affirms that the transfer of a merged corporation's property to the surviving corporation via merger is automatic and absolute: "The statute precludes any reversion, loss, or impairment of property and other interests of a constituent corporation as a result of its absorption into the new or surviving entity" (*Folk* at § 259.02).

Under both California and Delaware law, "the surviving corporation simply stands in the same position as that occupied by the merged corporation prior to the merger" (*Brunswick* at 753; *see also Maudlin* at 1016). Therefore, the rights and privileges owned by the merged entity are owned in the same measure by the surviving entity.

## II. NWNA IS THE OWNER OF THE ARROWHEAD WATER RIGHTS THROUGH A SERIES OF SPECIFIC CONVEYANCES AND MERGERS.

### A. NWNA Holds Valid, Superior Water Rights.

NWNA is the legal successor-in-interest to California Consolidated Water Company and therefore holds valid water rights including pre-1914 surface water rights (collectively, the "Arrowhead Water Rights"), perfected by its predecessors-in-interest (including ASC and CCWC) and as confirmed by the final and unappealable judgment of the Court in *Del Rosa Mutual Water Company v. Carpenter*, No. 31798 (Cal. Super. Ct., Oct. 19, 1931) (*see* Exhibit A).

### B.     CCWC Acquired and Exercised the Arrowhead Water Rights.

The original spring water business using the Arrowhead springs was created in the late 19th Century by Arrowhead Springs Corporation ("ASC"). In 1929, ASC conveyed and granted the Arrowhead Water Rights to California Consolidated Water Company, a Delaware corporation ("CCWC"), pursuant to that certain Warranty Deed recorded on March 12, 1929, in Book 476, Page 175 of the Official Records of San Bernardino County, California (the "Official Records") (*see* Exhibit B). The Warranty Deed granted to CCWC, among other things:

> All subterranean waters in . . . Strawberry and Cold Water Canyons (also known as East Twin Creek), belonging to the grantor, including all waters now being developed and produced by said grantor in said Canyons. . . .

(Warranty Deed at p. 176).

As discussed above, California law recognizes the ability of parties to transfer water rights by deed. Therefore, as a result of the Warranty Deed, CCWC became the lawful owner of the Arrowhead Water Rights.

### C.     California Courts Confirmed that CCWC Was the Lawful Owner of the Arrowhead Water Rights.

In 1931, competing claimants to water rights in the upper reaches of Strawberry Canyon had their respective water rights definitively adjudicated in *Del Rosa Mutual Water Company v. Carpenter*, No. 31798 (Cal. Super. Ct., Oct. 19, 1931) ("*Del Rosa*"). As a result of the binding precedent in *Del Rosa*, CCWC legally held all right, title, and interest to the Arrowhead Water Rights. According to the *Del Rosa* Court:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED . . . That defendant, [CCWC], is, subject to the provisions of [existing agreements between CCWC and ASC], the owner of the right to take, impound, divert, transport and carry away water of . . . any and all springs situated or obtainable in that part of East Twin Creek known as "Strawberry Creek and Canyon". . . .

(*Del Rosa* at p. 10).

*Del Rosa* not only adjudicated the water rights of CCWC and quantified them, but also adjudicated the rights of the only legally-recognized competing interest to those water rights in East Twin Creek, Del Rosa Mutual Water Company, to the extent such rights were impacted by the upstream diversion from the Strawberry Creek springs. The *Del Rosa* Court specifically held that CCWC was the rightful owner of all of the water in the headwater springs that are tributary to Strawberry Creek, and that the CCWC had the right under California water law to develop all such water obtainable in the area by diversion or otherwise, and to transport the water out of the watershed. *Del Rosa* is precise and clear that the rights held by CCWC include all of the water flowing or obtainable from certain springs tributary to Strawberry Creek. *Del Rosa* established

that CCWC and its successor businesses had the right to divert all water in Strawberry Creek (including the water previously belonging to Del Rosa Mutual Water Company).

In reasonable and foreseeable reliance on the *Del Rosa* Judgment, NWNA (and its predecessors-in-interest) have, without further judicial restriction, continuously developed, collected, transported, bottled, and sold spring water harvested under the Arrowhead Water Rights.

### D. The Arrowhead Water Rights Were Transferred to NWNA through a Specific Series of Grants and Mergers from 1938 through 1993.

#### 1. CCWC Merged Into Old Puritas (1938-1959).

Subsequent to *Del Rosa*, CCWC merged into Arrowhead and Puritas Waters Inc., a California corporation ("Old Puritas"), as evidenced by the Agreement of Merger filed with the California Secretary of State on December 31, 1938 (*see* Exhibit C.)  Old Puritas then changed its name to "Arrowhead and Puritas Waters Inc. of San Francisco" ("Old Puritas SF") as evidenced by the Certificate of Amendment filed with the California Secretary of State on January 4, 1954 (*see* Exhibit D.)

As discussed above, the Arrowhead Water Rights were transferred from CCWC to Old Puritas SF as a result of the merger and name change (*see* CAL. CIV. CODE § 1039; CAL. CORP. CODE § 1107(a); *see also Maudlin* at 1016).  No separate deed or other conveyance was necessary.

#### 2. Old Puritas SF Quitclaimed Arrowhead Water Rights (1959-1969).

Old Puritas SF quitclaimed the Arrowhead Water Rights to Arrowhead and Puritas Waters, Inc., a California corporation ("Puritas"), pursuant to that certain Quitclaim Deed recorded on January 16, 1959, in Book 4706, Page 28 of the Official Records (*see* Exhibit E). Puritas then granted the Arrowhead Water Rights to New Arrowhead, Inc., a California corporation ("New Arrowhead"), pursuant to that certain Grant Deed dated March 27, 1969 and recorded on April 9, 1969, in Book 7211, Page 478 of the Official Records (*see* Exhibit F).

As discussed above, since water rights are real property rights, they can be transferred by deed.  Therefore, as a result of these deeds, the Arrowhead Water Rights were transferred to New Arrowhead (*see* CAL. CIV. CODE § 1091; *Stepp* at 253).

#### 3. Arrowhead Water Rights Were Acquired by Arrowhead Water Corp. (1969-1993).

New Arrowhead changed its name to "Arrowhead Puritas Waters, Inc." ("New Puritas") as evidenced by the Certificate of Amendment filed with the California Secretary of State on March 31, 1969 (*see* Exhibit G).  New Puritas merged into Arrowhead Drinking Water Co., a Delaware corporation ("ADW"), as evidenced by the Certificate of Ownership and Merger filed with the Delaware Secretary of State on February 26, 1987 (*see* Exhibit H).  ADW then merged into BCI Arrowhead Drinking Water Co., a Delaware corporation ("BCI-ADW"), as evidenced by the Certificate of Ownership and Merger filed with the Delaware Secretary of State

on February 26, 1987 (*see* Exhibit I).  BCI-ADW then changed its name to "Arrowhead Water Corp." ("AWC") as evidenced by the Certificate of Merger filed with the Delaware Secretary of State on August 6, 1987 (*see* Exhibit J).

The Arrowhead Water Rights were transferred to AWC as a result of the mergers and name changes noted above (with respect to California law, *see* CAL. CIV. CODE § 1039; CAL. CORP. CODE §§ 1107(a), 1108; *see also Maudlin* at 1016; with respect to Delaware law, *see* DEL. CORP. CODE § 259(a); *see also Texaco* at 500; *Folk* at §§ 259.01, 259.02).

### 4. Arrowhead Water Rights Were Transferred to NWNA (1993-Present).

AWC merged into Deer Park Spring Water Incorporated, a Delaware corporation, as evidenced by the Agreement of Merger filed with the Delaware Secretary of State on December 14, 1993, and the surviving corporation changed its name to "Great Spring Waters of America, Inc." ("GSWA") (*see* Exhibit K).  GSWA changed its name to "Nestle Waters North America Inc." as evidenced by the Certificate of Amendment filed with the Delaware Secretary of State on May 1, 2002 (*see* Exhibit L).

NWNA became vested with the Arrowhead Water Rights as a result of this merger and name change (*see* CAL. CIV. CODE § 1039; DEL. CORP. CODE § 259(a); *see also Texaco* at 500; *Folk* at §§ 259.01, 259.02).  NWNA is, therefore, the holder of the Arrowhead Water Rights as confirmed by *Del Rosa*.  These rights have remained unchallenged for nearly a century, and the *Del Rosa* Court's order is final and unappealable.

## III. NWNA HAS SUCCEEDED TO, AND IS THE PERMITTEE UNDER, THE SUP.

### A. As a Matter of Law, Permits Will Run to the Benefit of Successor Companies.

Permits, like property rights, are also transferrable as a result of a merger.  The law in California and Delaware is clear: permits issued in the name of a company may be validly exercised by a successor company following a merger.  Under the California and Delaware General Corporation Laws, upon a merger of two corporations, the surviving corporation automatically succeeds to the rights of the merged corporation(s).  Under California law, "the surviving corporation shall succeed, without other transfer, to all the rights . . . of each of the disappearing corporations" (CAL. CORP. CODE § 1107(a); *see also Maudlin* at 1016).  A similar rule exists under Delaware law: "all the rights, privileges, powers and franchises of each of said [merged] corporations . . . shall be vested in the corporation surviving" (DEL. CORP. CODE § 259(a); *see also Texaco* at 500; *Folk* at §§ 259.01, 259.02).

In the absence of express language regarding mergers, the existence of a no-assignment clause in a contract is not sufficient to prevent contractual rights from passing by operation of law to the surviving corporation in a merger (*see Folk* at § 259.02; *see also Brunswick* at 750).  In *Brunswick*, the leading case on this issue for over 35 years, the U.S. District Court for the Eastern District of Pennsylvania explained the public policy interest underlying this rule:

> The reason for refusing to apply a "no-assignment" clause to avoid
> an involuntary assignment is pragmatic: such transfers do not
> entail any increase in the risk or hazard assumed by [the

> counterparty to the contract] . . . . In the absence of explicit language prohibiting assignment of [the contract] through merger, the Court will not deprive the surviving corporation of the protection bargained and paid for by the merged corporation.

(*Brunswick* at 753).

### B. NWNA Is Legal Successor Under the SUP.

#### 1. The USFS Issued the SUP to New Puritas.

Since 1930, the USFS has issued special use permits to NWNA's predecessors-in-interest for their water transport operations in the San Bernardino National Forest (the "SBNF"). Most recently, in 1978, the USFS issued the SUP to Arrowhead Puritas Waters, Inc. The SUP is for a five-foot (5') right-of-way for the maintenance of a four-inch (4") gravity-fed water transmission pipeline (the "Pipeline") across a portion of the SBNF. The Pipeline transports spring water from the Arrowhead Springs over the SBNF to NWNA's loading facilities, which are located on private property adjacent to the SBNF. While the terms of the SUP do include a no-assignment clause, they do not include any express language regarding mergers.

In reasonable reliance on the SUP, NWNA has (and its predecessors-in-interest have) invested substantial amounts to develop and maintain the pipeline, and continuously operated under the SUP.

#### 2. Through a Series of Mergers and Name Changes, NWNA has Succeeded to the Interests of New Puritas.

NWNA is the successor to the original holder of the SUP, Arrowhead Puritas Waters, Inc., by merger. As set forth in Section II(D)(3)-(4) above, Arrowhead Puritas Waters, Inc. merged into ADW, which then merged into BCI-ADW, which then changed its name to "Arrowhead Water Corp.," which then merged into GSWA, which then changed its name to "Nestle Waters North America Inc."

It is important to note that since the terms of the SUP never prohibit a transfer by merger—in fact, they contain no express language at all regarding mergers—the no-assignment clause does not legally prevent the SUP from being exercised by the merged entity. The SUP (originally issued in 1978) was never individually "transferred" within the meaning of the SUP through a deed or other conveyance. Rather, all transactions since 1977 have been mergers. Therefore, under the rules established by the federal court in *Brunswick*, the SUP is validly held by NWNA.

As a result of these corporate transactions, and because the terms of the SUP do not include any express language regarding mergers, the SUP is now held by NWNA as a result of the noted series of mergers (with respect to California law, *see* CAL. CIV. CODE § 1039; CAL. CORP. CODE §§ 1107(a), 1108; *see also Maudlin* at 1016; with respect to Delaware law, *see* DEL. CORP. CODE § 259(a); *Brunswick* at 753; *see also Texaco* at 500; *Folk* at §§ 259.01, 259.02). Therefore, NWNA is the legal holder of the SUP.

## IV. THE SUP REMAINS IN FULL FORCE AND EFFECT.

### A. Federal Permits Remain in Full Force and Effect During Reissuance Process.

The SUP, like other federal permits, remains legally valid and in full force and effect during the reissuance process. The SUP is a permit that is subject to the Administrative Procedure Act (the "APA") (*see generally* 5 U.S.C. §§ 500, *et seq.*; *see also* 5 U.S.C. §§ 551, 558). Under the APA, a permit for "an activity of a continuing nature" that is expired by its terms, but for which the reissuance process has timely commenced, remains in full force and effect until the issuing agency renders a final decision regarding permit reissuance (*see* 5 U.S.C. § 558; *see also Miami MDS Co. v. FCC,* 14 F.3d 658, 659 (D.C. Cir. 1994)).

### B. NWNA's SUP Remains in Full Force and Effect Today.

NWNA's SUP remains in full force and effect pursuant to the terms of the APA. In 1987, in accordance with the terms of the SUP, BCI-ADW timely initiated the reissuance process for the SUP with the USFS. The process remains ongoing, and NWNA's water transportation operations inarguably constitute an "activity of a continuing nature" (having commenced in the 19th Century). In reasonable reliance on the ongoing renewal process, NWNA (and its predecessors-in-interest) have continuously operated under the SUP and have continued to comply with all the terms and conditions of the SUP.

As a result, the SUP remains legally valid and in full force and effect until the USFS renders a final decision regarding reissuance of the SUP (*see* 5 U.S.C. § 558; *see also Miami* at 659). Therefore, NWNA has the right to maintain the Pipeline pursuant to the terms of the SUP.

## V. NWNA IS THE LEGAL HOLDER OF THE ARROWHEAD WATER RIGHTS AND THE SUP, WHICH REMAINS IN FULL FORCE AND EFFECT.

As set forth above, under long-settled California, Delaware, and Federal law, NWNA is the legal owner of the Arrowhead Water Rights, NWNA is the legal permittee under the SUP, and the SUP remains in full force and effect.

**Table of Exhibits**

Exhibit A – *Del Rosa* Judgment
Exhibit B – Warranty Deed
Exhibit C – Agreement of Merger
Exhibit D – Certificate of Amendment
Exhibit E – Quitclaim Deed
Exhibit F – Grant Deed
Exhibit G – Certificate of Amendment
Exhibit H – Certificate of Ownership and Merger
Exhibit I – Certificate of Ownership and Merger
Exhibit J – Certificate of Merger
Exhibit K – Agreement of Merger
Exhibit L – Certificate of Amendment