# EXHIBIT 10

**Nestlé Waters North America Inc.**

5772 E. Jurupa Street
Ontario, CA
91761



August 24, 2018

**VIA HAND DELIVERY**

Mr. Joseph Rechsteiner
District Ranger
San Bernardino National Forest
1209 Lytle Creek Road
Lytle Creek, CA 92358

Re: Transmittal of Nestlé Waters North America Inc. (NWNA) Signed Special Use Permit

Dear Mr. Rechsteiner:

This letter transmits signed copies of NWNA's Special Use Permit No. FCD728501 (Permit) for the use and occupancy of National Forest System Lands in the San Bernardino National Forest (SBNF), received on June 27, 2018. Enclosed you will find three copies of the Permit and a signed amendment to the Cost Recovery Agreement. We have assumed that you will fill in the blanks on page 1 of the Permit to provide that the Permit will expire at midnight on August 24, 2021. While I have signed the Permit, I am doing so under protest because you have made it clear—through words and actions—that we have no choice other than to sign the Permit today.

NWNA appreciates the work the U.S. Forest Service (USFS) has done to process NWNA's permit application. NWNA and its Arrowhead® Brand Mountain Spring Water take environmental stewardship and sustainable use of water resources very seriously. We also understand the USFS's focus in recent months has been directed more toward the California wildfires. We, for our part, have also been active in working with the American Red Cross to provide much-needed Arrowhead® Brand Mountain Spring Water for first responders, as well as allowing one of our facilities in Northern California for use as a staging ground for emergency, disaster-related operations. Accordingly, we understand that your efforts to prepare the Permit and associated documents are one of your many priorities, and we appreciate your attention to this project.

I have also received and reviewed your letter dated August 22, 2018 (Letter), which clarified the USFS's understanding and intent regarding the implementation of certain terms outlined in the AMP and Permit. We agree with you that a critical purpose of the Permit is to study Strawberry Canyon in order to develop the needed biological, hydrological, and hydrogeological data: "As this initial permit is a study permit, the actions are provided to assist in the overall basin hydrologic and biologic characterization . . ." (Letter at page 1). These data will be critical in preparing an objective, science-based AMP. We appreciate your efforts in preparing the Letter. However, the Letter also confirmed that many of our concerns with respect to the Permit are well-placed, and remain unresolved.





Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 2

With regards to the Permit, we are being asked by you to now complete what in our view remains an incomplete Permit. While I have signed the Permit—and NWNA is commited to the Permit and applicable law—I feel that it is important to outline some of the inconsistencies that we have identified in the Permit for your reference. As we have discussed, there are areas of the Permit that are inconsistent with the Decision Memo (Memo), internally inconsistent, inconsistent with applicable law, not reflective of the intent of USFS staff, and, in certain areas, operationally impossible to achieve. Despite our requests, however, the USFS has not provided data or documentation to back up its hypotheses, has not scheduled a Headquarters-level meeting to discuss these issues, and has declined to make any changes to the Permit and associated documents.

NWNA willingly and actively cooperated in the USFS's permit process beginning in the Spring of 2015 when the USFS began processing the application that NWNA had submitted in 1987. Over the course of more than two years, NWNA provided 22 technical deliverables, 13 hydrological deliverables, 30 biological deliverables, 6 administrative/legal deliverables, and provided monthly status reports, including hydrological data. Included in this coordination have been several meetings between NWNA and USFS staff, as well as regular staff level conference calls. NWNA also submitted extensive comments in May 2016 to the USFS proposed action, which included a draft Adaptive Management Plan (AMP) that it later amended to reflect the scientific knowledge generated as part of the permit renewal process and submitted in December 2017. Throughout this process, NWNA repeatedly shared its concern that any AMP must be designed to collect objective data, to establish specific criteria that may be used to evaluate the effects of project operations, and to provide an informed framework to adapt operations to the extent necessary to meet the SBNF objectives. Throughout this process, the USFS has acknowledged that NWNA has complied with applicable law and remains in compliance with its existing permit (*see* Memo at page 10).

When I met with you and the USFS technical team on August 1, 2018, two points were made clear to us. First, we initially understood that it was not the intent of the USFS to shut down NWNA's water collection operations in Strawberry Canyon because the "triggers" included in the AMP outline attached as part of the Permit needed to be construed as "goals" requiring study (despite the language used in the AMP outline). However, it would seem that our initial understanding was misplaced. Based on the terms of Letter, the USFS appears to be prepared to unilaterally shut down (or substantially restrict) NWNA's water collection operations in Strawberry Canyon if NWNA cannot meet the "triggers" set forth in the AMP—despite the fact that these "triggers" are operationally impossible to achieve (Letter at page 1).

Second, you explained that the USFS had internally prepared hypotheses but was hesitant to share these materials with NWNA during a pending FOIA request (and with the expectation that these materials would be shared informally, we withdrew the FOIA request). We note that no materials have as yet been shared with NWNA describing the data, analyses, and

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 3

information used to develop the hypotheses. This has made it impossible to have constructive and substantive discussions on certain critically important technical topics related to components of the AMP.

Despite NWNA's efforts throughout the Permit application process, the USFS drafted and offered a Permit with provisions that do not address NWNA's concerns, and drafted an AMP outline without meaningful collaboration or input from NWNA. Furthermore, the Permit and the Memo raise a number of additional technical issues. We were hopeful that these issues could have been addressed before we were required to sign the Permit. We have included a detailed summary of certain of these issues below.

A.   Permit Authorizes Use of USFS Land Only.

The Memo does not accurately describe the operations authorized by the Permit, and implies that the Permit authorizes water collection (rather than the use of land). While the Memo states that "Nestle's project purpose is to continue to operate and maintain the existing system to supply bottled drinking water for retail sale" (Memo at page 1), the Memo goes on to justify restricting NWNA's water uses:

> "LMP Standard 46 requires that water extraction will only be authorized when the user demonstrates that the water extracted is excess to the needs of National Forest resources. Under the LMP standards, if the riparian resource needs are met, any water in excess of that need is available for extraction" (Memo at page 25; *see also* Memo at page 29).

This is an inconsistent and unsupportable error in the Permit. This is not an accurate characterization of NWNA's renewal application, and is based on the false premise that the Permit authorizes water collection. NWNA's permit renewal application requested (and the Permit authorizes) the use of USFS land to access NWNA's spring sites—the Permit does not authorize the collection of spring water. The Permit expressly acknowledges that it is for the use and occupancy of USFS land, sets fees for the use of land (not water), and "does not confer any water rights." Rather, any "necessary water rights must be acquired by the holder in accordance with State law." Nevertheless, the Permit sets substantial restrictions on NWNA's water collection. This is fundamentally inconsistent.

B.   Permit Documents Conflict with Controlling Water Rights Law.

   1.   Permit Unlawfully Restricts Beneficial Use.

The Permit conflicts with controlling water rights law by restricting NWNA's beneficial use of its spring water. The Permit states that "Nestle will install suitable shut-off valves or other flow control devices to ensure that water will not be extracted in excess of the holders ability

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 4

to store or transport water without waste or spillage from local storage" (Appendix B at page 1; *see also* Memo at page 1).

Under California law, a water rights holder may put its water to reasonable and beneficial use; the USFS incorrectly seeks to unilaterally—and without legal authority—limit what constitutes a beneficial use. NWNA's 1987 renewal application letter does not identify a specific beneficial use for the water, and the Permit does not authorize spring water collection. NWNA has the right under California law to use its spring water for any beneficial use.

Moreover, the USFS does not have the power or authority to regulate NWNA's activities outside the boundaries of the SBNF. NWNA's activities on private property—like those of any other private party—are outside the jurisdiction of the USFS.

  2. <u>Permit Unlawfully Restricts Water Collection</u>.

The Permit conflicts with controlling water rights law by unlawfully restricting NWNA's collection of its spring water. The Permit states that "[s]urface water diversions and groundwater extractions . . . will only be authorized when . . . the water extracted is excess to the current and reasonably foreseeable future needs of forest resources" (Appendix B at page 5). The Memo invokes FLPMA and the LMP as the basis for these restrictions (Memo at page 25; *see also* Memo at pages 3, 13, 21-23, 29).

The SBNF was created subject to existing water rights. The USFS cannot use the LMP and/or FLPMA to curtail senior water rights that pre-date the creation of the SBNF. The Permit's resource mitigation measures (including the AMP outline) will materially restrict the lawful exercise of, and will infringe upon, NWNA's senior water rights.

The Letter references the USFS's incorrect understanding of governing California water rights law (Letter at page 1). By arbitrarily restricting the use of NWNA's senior water rights, the USFS has, in substance, confiscated NWNA's senior water rights.

  3. <u>Permit Unlawfully Benefits Junior Right at Expense of Senior Right</u>.

The Permit conflicts with controlling water rights law by unlawfully restricting the exercise of NWNA's senior water rights for the benefit of the USFS's junior water right. The USFS effectively requires NWNA to subordinate its senior water rights to the USFS's junior water right, by demanding that NWNA curtail its senior water right to protect the USFS's (admitted) junior water right (*see* Appendix B at page 6; *see also* Memo at pages 3, 21-22).

The USFS has failed to acknowledge that the USFS's claimed water rights—which it claims under California law—are junior to NWNA's senior water rights. Under California law, junior water rights are subordinate to senior water rights. It is unlawful for the USFS to use

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 5

unrelated regulatory powers to attempt an end run around controlling California water rights law.

The SWRCB staff report also calls into question the USFS's claimed water right (A6108)—the right is arguably defunct and possibly abandoned. The USFS has failed to acknowledge this skepticism. NWNA understands that the USFS has not used its water rights for the purposes described in its license (A6108). Finally, the USFS has not filed for such in-stream flows, and therefore has no legal basis to require such a stream flow.

    4.    <u>Permit Mischaracterizes SWRCB Staff Report</u>.

The Permit documents misstate California water law by mischaracterizing the SWRCB staff report as a "recent report," rather than a preliminary draft report (Memo at page 3; *see also* Memo at pages 21-22, 27).

This "recent report" is a preliminary draft report filed by the SWRCB staff. Certain of the conclusions in the report have been addressed in three subsequent submissions to the SWRCB, and the report is subject to revision until final acceptance/adoption by the full SWRCB (if any). Until then, it is non-binding and has no legal force or effect.

C.    <u>Permit Documents Are Inconsistent on NEPA Issues</u>.

    1.    <u>Claim of No Administrative Changes Inconsistent</u>.

Contrary to the terms of the Memo, the Permit includes new requirements that are not administrative in nature. We therefore question whether the use of a Categorical Exclusion is appropriate. The Memo states that the USFS action "fits within the category of actions . . . identified in agency procedures as 'Issuance of a new special use authorization for a new term to replace an existing or expired special use authorization when the only changes are administrative' . . ." (Memo at page 10). However, the Permit requires NWNA to install and maintain new shut-off valves and new wildlife drinkers, among other new requirements (*see* Appendix B at pages 1-2; *see also* Memo at page 25).

The Permit fails to satisfy the stated standard, and makes major, non-administrative changes, such as: (i) regulating the collection of water; (ii) regulating helicopter flights and landing sites; (iii) requiring the installation of wildlife drinkers and stream gauges; and (iv) requiring an AMP that includes specific, arbitrary responsive actions that have not been shown to be feasible. Changes like these are substantive, not merely administrative, and will likely have environmental consequences.

    2.    <u>Claim of No Extraordinary Circumstances Inconsistent</u>. The Memo makes conflicting claims regarding whether extraordinary circumstances are present. The Memo states that "there are no extraordinary circumstances that would warrant further analysis and

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 6

documentation in an EA or EIS" (Memo at page 10). However, the Memo later claims that "current water extraction is drying up surface water resources (springs and streams) that would have normally been perennial water resources (Memo at page 13; *see also* Memo at page 18). NWNA categorically denies that its water collections are causing this impact.

The USFS's finding of "no extraordinary circumstances" is inconsistent with its arbitrary conclusion that water collection is "drying perennial resources" and creating conditions that are not "acceptable."

D.  Permit Documents Are Inconsistent on Mechanical Issues.

   1.  Permit Term Inconsistent.

The Memo describes the Permit term as three years, with two additional one-year extensions. "The initial permit term will be three (3) years, with discretionary annual permits for an additional two (2) years" (Memo at page 3; *see also* Memo at page 26). However, the Permit does not mention these extensions, and states that the Permit "is not renewable" (*see* Permit at pages 1-2).

This inconsistency results in a direct conflict between the Memo and the Permit. The process for renewing the Permit for the additional two years should be stated in the Permit. In addition, the reference to "discretionary annual permits" may violate USFS regulations, which do not appear to provide for these.

   2.  Operational Provisions Inconsistent.

The Permit includes various operational requirements that conflict with one another. NWNA is required to install new shut-off valves and wildlife drinkers within 30 days after the USFS approves NWNA's Operating Plan (*see* Appendix B at pages 1-2). NWNA is required to limit its activities to certain operating periods in order to minimize disturbance during breeding season (Appendix B at page 1). However, the Permit also requires continuous monitoring of NWNA's operations (Appendix B at page 6). The Permit also requires two weeks' advance notice prior to helicopter flights in all circumstances (*see* Appendix B at page 2).

The installation of the shut-off valves and drinkers will likely require more time to permit and implement than allotted in the Permit. The continuous monitoring requirements conflict with the limited operating periods, and will increase the necessary number of helicopter flights and access trails. Finally, while advance notice for helicopter flights may be possible in many circumstances, the Permit must make provision for extenuating circumstances.

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 7

       3.       Emergency Work Provisions Inconsistent.

The Memo suggests that NWNA will have operational flexibility to address emergency work. "Work on the system may be required on an emergency basis and emergency repair to pipelines and structures are conditionally authorized under this new permit" (Memo at page 6). However, the Permit does not include any such provisions. These authorizations and requirements articulated in the Memo should be added to the Permit.

       4.       Statements on Compliance Inconsistent.

The Memo takes inconsistent positions regarding NWNA's compliance with the terms of the current permit. The Memo states that "Nestle is in full compliance with their existing permit" (Memo at page 10), but later claims that substantial additional monitoring "is necessary to determine compliance with current law, policy, the LMP, and permit conditions" (Memo at page 10). This substantial new monitoring under the Permit is inconsistent with NWNA's being in compliance under the existing permit.

       5.       Statements on Baseline Inconsistent.

The Permit and the Memo take inconsistent positions regarding the baseline condition for the Permit Area. The Memo states that the "baseline for the environmental analysis is the current condition as it exists today" (Memo at page 18). However, the Permit's AMP outline requires using water from the springs to increase water flow to create areas for restoration of riparian vegetation and/or to provide wildlife drinkers (Appendix B at page 10). These positions are fundamentally inconsistent: if the baseline is the current condition of the Permit Area, then increasing water flow to increase riparian vegetation will change the environment from the baseline condition.

E.       Permit Documents Use Vague and Ambiguous Language.

The Permit uses vague, ambiguous, and/or incomplete language when describing certain requirements and processes. The Permit states that adaptive management "provides flexibility to respond to monitoring information that indicates that desired conditions are not being met" (Appendix B at page 4). The AMP outlines also includes trigger points "where the Forest Plan objective is not being met," and states that "the AMP may be amended based on the results of the paired basin studies. . ." (Appendix B at pages 4-5).

The term "desired conditions" is vague, subjective, and undefined—such an ambiguous term is difficult to comply with. In addition, the AMP outline does not describe any actions NWNA may take where Forest Plan objectives *are* being met. We assume that while all objectives are being met, NWNA's water collection will be unaffected. Finally, the AMP should also be amended based on the results of shut-in tests or any other actions NWNA

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 8

takes to determine effects of its water collection (not just based on the results of the paired basin study).

F.    Permit Contemplates NWNA Activities Outside Permit Area.

The Permit documents contemplate that NWNA will undertake certain activities outside the Permit Area, but do not specify where the authorization for those activities would come from. The Permit requires NWNA to conduct a paired basin study in East Twin Creek, including substantial monitoring (Appendix B at pages 3, 7-11). The Memo also states that the paired basin study "will require clearing of helispots in the East Twin Creek drainage" (Memo at page 5). However, East Twin Creek is not included in the authorized Permit Area (*see* Permit at page 1; Appendix A).

The East Twin Creek drainage—which is required to be studied in the paired basin study—is outside of the Permit Area. The USFS cannot arbitrarily grant this permission to access and use East Twin Creek. These operations (including, without limitation, monitoring, and the clearing and use of helispots) are not authorized by the Permit, and the Memo does not explain how these actions will be reviewed or authorized. These extraterritorial requirements lack any basis in law. In addition, these activities may require additional permits and approvals. There is no provision for what happens if the necessary permits and approvals are not granted. Finally, there are no established access routes into East Twin Creek, and significant environmental impacts are foreseeable if roads, trails, and helispots are to be cut into the otherwise undisturbed landscape. The Letter attempted to address the paired basin study, but failed to resolve the issues described above (*see* Letter at page 1).

G.    USFS Makes Conclusions Without Any Scientific Basis.

   1.    No Scientific Basis for Arbitrary Finding of Decreased Surface Flows.

The Memo arbitrarily states that water collections have reduced downstream surface flows (Memo at page 13). However, the Memo fails to analyze this purported relationship or the effects of the purported reduced downstream flows. The Memo's conclusion incorrectly assumes that flow is always present in the Strawberry Creek watershed, which—contrary to the USFS's unsupported assumption—is an intermittent stream channel. Furthermore, no consideration or recognition is given to effects caused by other water users or climate factors. The Memo also provides no basis for addressing downstream flows (particularly those outside of USFS jurisdiction) absent a demonstration of a connection between upstream water collection and downstream flows.

   2.    No Scientific Basis for Required Minimum Flows.

The USFS's proposed required minimum flows lack any objective scientific basis. The Memo states: "Based on the record and the analysis provided by staff, I have concluded that

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 9

minimum flows are required. . . . The paired basin study and adaptive management plan provide practices to adjust those minimum flows during the permit term to ensure that resource mitigation measures are met . . ." (Memo at page 29). As you will recall, the USFS discussed providing its analysis, and with the expectation that the analysis would be shared informally, NWNA withdrew its FOIA request for that analysis. As of today, the USFS has not provided any such studies. Without such studies, there can be no discussion of the scientific basis for the proposed required minimum flows.

The USFS assumes without proof that there is a hydraulic connection between certain areas. The AMP outline's actions regarding flows (Appendix B at page 6) are conclusions without any scientific evidence. The USFS hypothesis that the 20 gpm requirement is directly affected by collection at boreholes 10, 11, 12 and tunnels 2, 3 and boreholes 7, 7A, 7B, 7C is not supported by NWNA's own studies—and the USFS has provided no evidence whatsoever—so based on the available evidence, this hypothesis is, in fact, demonstrably false.

   3.  <u>No Scientific Basis for Paired Basin Study</u>.

The AMP outline requires the study of East Twin Creek, but establishes triggers without first developing the data. "The permittee will study comparison sites in adjacent unmanaged drainages to determine what conditions would exist in Strawberry Creek without water extraction in the upper watershed. This approach is typically referred to as a 'paired basin' study" (Appendix B at page 3; *see also* Appendix B at pages 7-11).

There is no scientific basis for comparing different canyons with the expectation that the differing geologic and topographic environments will produce identical or even reasonably similar riparian environments. The selection of East Twin Creek is without regard to different features and variables that would affect the outcome of the study.

Moreover, NWNA does not agree that conducting an investigation of East Twin Creek (or any canyon other than Strawberry Canyon) offers any scientific value to species considerations in Strawberry Canyon (Appendix B at page 9). NWNA has collected several years' worth of hydrologic and riparian habitat data in Strawberry Canyon. No hydrologic or habitat data have been collected on East Twin Creek. A suitable comparison of these two watersheds to establish a common baseline will take several years, precluding the implementation of any meaningful comparison criteria within the timeframe of the Permit.

NWNA also does not agree that basing triggers on observation of species conditions in East Twin Creek (Appendix B at page 10) is scientifically valid given the manifest differences in area, topography, slope aspect, geologic structure, and other known differences. Basing triggers on "expected" aquatic life forms that are tied to another watershed (for which no data exist) is speculative, unrealistic, and unsupportable.

Finally, the paired basin study is not scientifically sound, because requiring NWNA to make Strawberry Canyon mirror the ecological conditions of a separate canyon with distinct geology is physically impossible. Width to depth ratio similarity may never be achieved given the dissimilar topographic and geologic conditions.

4. Permit Requires Actions Without Understanding Potential Effects.

The AMP outline requires numerous actions without first understanding their potential effects. The AMP outline requires the development and installation of new shut-off valves and new wildlife drinkers (Appendix B at pages 1-2). The AMP outline also includes flow triggers of 20 gpm and 6.25 gpm (Appendix B at page 6). However, the USFS has not studied the potential effects of any of these requirements.

The USFS has not analyzed the effects of water shut-off/water overflow in Strawberry Creek in areas of potential critical habitat. In addition, the impacts of the two drinkers have not been studied. Development and installation of each drinker may itself require additional environmental analysis. The USFS has not analyzed the effects of increasing flows to 20 gpm and 6.25 gpm, which could cause substantial changes to the environment.

5. No Evidence that Permit Actions Will Have Desired Effects.

The AMP outline's required actions in response to triggers include using water from the diversion sites to increase water flow to create areas for restoration of riparian vegetation and/or to provide water to wildlife drinkers and to continue irrigating to support native vegetation and wildlife habitat (Appendix B at page 10; Memo at page 18). However, there is no demonstrated relationship between these actions and the observed conditions. Furthermore, the AMP outline assumes that a new (and unstudied) condition of Strawberry Canyon which predates water collection can be recreated.

6. Permit Documents Use Arbitrary Requirements.

The Permit sets arbitrary requirements that lack any scientific basis. The AMP outline requires NWNA to "[c]ontinue the addition of water (irrigation) . . . if determined that less than 70% of expected aquatic life forms and communities are present based on riparian studies" (Appendix B at page 2). The AMP outline also provides that "[s]urface water diversions and groundwater extractions . . . will only be authorized when . . . the water extracted is excess to the current and reasonably foreseeable future needs of forest resources" (Appendix B at page 5).

The requirement of "less than 70%" is an arbitrary percentage without any scientific basis. The USFS has not provided any data or literature to support this percentage. In addition, the USFS has not provided written, objective measures that determine the "current and reasonably foreseeable future needs of forest resources." This requirement does not appear to

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 11

have any objective or scientific basis. Finally, the 6.25 gpm and 20 gpm minimum flow triggers are arbitrary and subjective numbers not explained by the USFS (Appendix B at page 6).

In addition, the AMP outline sets trigger requirements for flows that do not consider all water users (including the USFS), yet NWNA is the only user required to take action. In addition, the monitoring components of Objective 2 – Riparian Standards (Appendix B at page 7) disregard the vibrant riparian conditions documented in Strawberry Canyon, and require the establishment or enhancement of riparian conditions at locations that may not be affected by water collection. Finally, the riparian standards triggers (Appendix B at page 8) include arbitrary and subjective observations such as "vigorous," "healthy," and "diverse." These terms lack an objective, scientific basis.

7. <u>Minimum Flow Requirements Are Impossible to Achieve</u>.

The AMP outline sets trigger requirements for flows that are impossible to meet (*see* Appendix B at page 6). The 6.25 gpm trigger is physically impossible to achieve. The 6.25 gpm trigger requires that NWNA force water to flow approximately 157 feet *uphill*, inside the mountain. The trigger would require that NWNA shut down certain water sources until this condition is met, even though the condition is not possible to meet as defined. The 20 gpm condition is also impossible to achieve. The 20 gpm trigger requires that NWNA cause 20 gpm to flow through a semi saturated channel over a distance of approximately 0.9 miles without infiltrating. The trigger would require that NWNA shut down certain water sources until this condition is met, even though the condition is not possible to meet as defined. In addition, the triggers do not consider all water users (including the USFS).

The Letter confirms that the above concerns are well-placed. The USFS has interpreted the AMP "triggers" as actionable triggers, and not mere goals:

> "The goals of the AMP may be achieved through a variety of scenarios and strategies. For instance, if the 20 gpm trigger is not met at the specified point, the AMP describes that the extraction is to be halted at the wells closest to the effected location. It does not specifically describe that all sites shall be shut-in at once" (Letter at page 1).

The USFS's willingness to unilaterally shut down (or substantially restrict) NWNA's water collection operations in Strawberry Canyon is troubling, given the impossible nature of the triggers. Moreover, the Letter implies that these water collection restrictions are the minimum that NWNA can expect: "As this initial permit is a study permit, the actions are provided to assist in the overall basin hydrologic and biologic characterization, not simply to permit maximum extraction while meeting the triggers" (Letter at page 1).

Mr. Joseph Rechsteiner
District Ranger
August 24, 2018
Page 12

H.      USFS Misstates Conclusions of Studies.

The Memo misstates the conclusions of prior studies. The Memo states that "[s]tudies completed by Nestle and validated by Forest Service field work have demonstrated that the current water extraction is drying up surface water resources (springs and streams) that would have normally been perennial water resources" (Memo at page 13; *see also* Appendix B at pages 3, 5).

This is a misstatement of the studies' conclusions. NWNA studies did not demonstrate, or show in any way, that current water collection is causing surface water resources to dry up. The USFS has not presented any scientific work to validate this claim. The claim is based on minimal analysis and is derived from a single data collection event described in an outdated 2002 report, which relied on field data from one survey of the canyon without an established baseline, no analysis of seasonal fluctuations, and incomplete analysis of hydrologic and riparian conditions. In addition, the AMP outline does not reflect the detailed hydrologic and riparian reports submitted by NWNA as part of scoping.

I.      USFS Mischaracterizes Voluntariness of NWNA AMP.

The Memo mischaracterizes NWNA's proposed AMP as voluntarily enforced (rather than voluntarily agreed to):

> "Nestle proposed a voluntarily Adaptive Management Plan during scoping and offered a detailed plan as an alternative action to the Forest Service proposed Adaptive Management Plan. Under this proposed approach, implementation of the Adaptive Management Plan would be discretionary on the permittees part. Under such a voluntary approach, the Forest Service would have no regulatory recourse if the permittee were to change its commitment to the plan" (Memo at page 24; *see also* Memo at page 25).

The USFS misstates NWNA's proposal. NWNA proposed an AMP that, if voluntarily *agreed to*, would become a binding (not discretionary) condition of the permit.

J.      Permit Purports to Force NWNA to Waive Claims.

The Permit requires NWNA to waive any compensable claims against the United States:

> "The United States reserves the right to place any conditions on . . . operation . . . of facilities to pump, divert, store, or convey water on National Forest System lands covered by this permit . . . . The holder waives any claims against the United States for compensation in connection with imposition of any conditions on . . . operation . . . of water facilities under this permit" (Permit at page 12).

This provision purports to force NWNA to waive any claim that the United States has curtailed NWNA's beneficial use of its water rights, resulting in a compensable taking. It is unreasonable and unjust for the USFS to unlawfully restrict NWNA's use of its senior water rights, and then force NWNA to waive any claims resulting from those unlawful restrictions.

We regret that we have not been afforded the opportunity to work together to develop a permit that protects public and natural resources, respects NWNA's water rights, and includes an AMP that is based on objective science. In order to continue operations as NWNA and its predecessors have for more than 122 years, based on our discussions with the USFS and the Letter, NWNA believes that it has no choice other than to sign—and is compelled to sign— the Permit, and implement the supporting documents as presently worded and in accordance with applicable law. The enclosed Permit is signed without waiving any rights held by NWNA (including, without limitation, NWNA's water rights, NWNA's right to file a takings claim, and NWNA's right to challenge the Permit), which NWNA hereby expressly reserves.

As described above, NWNA submitted a FOIA request to the USFS for the data and documentation that you used to support your hypotheses in the Permit and associated documents. We withdrew that request with the expectation that the data and documentation would be shared informally. If not shared by August 31, 2018, we reserve our rights to resubmit our FOIA request.

Finally, given the fact that we have not received the requested documents referenced in the Permit and the number of issues that we will need to work through, NWNA hereby reiterates its request for a 90-day extension for its submission of the draft AMP as required under the Permit. We appreciate your stating in the Letter that you feel this extension is reasonable. Please let us know if you would like to discuss this timeline.

We look forward to continuing to work together to implement this Permit, and to our meeting on September 4, 2018. Please feel free to contact me with any questions.

Sincerely,

Larry Lawrence
NWNA – Natural Resource Manager