## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLUETRITON BRANDS, INC.,

      *Plaintiff,*

v.

UNITED STATES FOREST SERVICE,
RANDY MOORE, in his official capacity
as Chief of the United States Forest Service,
CHRISTOPHER FRENCH, in his official
capacity as Deputy Chief for the National
Forest System of the United States Forest
Service, JENNIFER EBERLEIN, in her of-
ficial capacity as Regional Forester for the
Pacific Southwest Region of the United
States Forest Service, DANELLE HARRI-
SON, in her official capacity as Forest Su-
pervisor of the San Bernardino National
Forest of the United States Forest Service,
and MICHAEL NOBLES, in his official
capacity as Front Country District Ranger
of the United States Forest Service,

      *Defendants.*

Case No. 1:24-cv-2302

## REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Authorities.................................................................................................iii

Introduction ............................................................................................................ 1

    I.    BlueTriton Is Likely to Prove that the Notice of Denial Violates the APA. .............. 3

    A.    The Forest Service's Reliance on the State Board's Order is Post-Hoc Rationalization for the Notice of Denial...................................................................... 3

    B.    The Forest Service's Invocation of the State Board's Order Fails to Address Important Aspects of the Problem............................................................................ 4

    C.    The Forest Service's Issuance of the Notice of Denial Based on BlueTriton's Purported "Refusal" to Provide Information was Arbitrary and Capricious................. 9

    II.    BlueTriton Faces Irreparable Harm Absent an Injunction. .................................... 21

    III.    The Balance of Equities and the Public Interest Favor Issuing BlueTriton's Requested Preliminary Injunction. ........................................................................ 23

Conclusion............................................................................................................. 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adams v. United States,*
   3 F.3d 1254 (9th Cir. 1993) .................................................................. 10, 20

*Air Trans. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
   840 F. Supp. 2d 327 (D.D.C. 2012) ...............................................................23

*Cappaert v. United States,*
   426 U.S. 128 (1976).............................................................................. 3

*County of Okanogan v. National Marine Fisheries Service,*
   347 F.3d 1081 (9th Cir. 2003) ................................................................ 9

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020) ...........................................................................19

*Elko Cnty. Bd. of Sup'rs v. Glickman,*
   909 F. Supp. 759 (D. Nev. 1995).......................................................... 20, 21

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016)........................................................................19

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ...............................................................24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................................................*passim*

*N. Gualala Water Co. v. State Water Res. Control Bd.,*
   139 Cal. App. 4th 1577 (2006) ............................................................. 9

*Ohio v. EPA,*
   144 S. Ct. 2040 (2024) ............................................................... 1, 5, 6, 11

*Robertson v. Cartinhour,*
   429 Fed. App'x 1 (D.C. Cir. 2011)..........................................................23

*TikTok Inc. v. Trump,*
   507 F. Supp. 3d 92 (D.D.C. 2020) ..........................................................25

*United States v. Seckinger,*
   397 U.S. 203 (1970)........................................................................18

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................22

**Statutes**

5 U.S.C. § 706 ........................................................................................................21

43 U.S.C. § 661 ............................................................................................... 3, 9, 20

Cal. Civ. Proc. Code § 1094.5(g) ........................................................................... 5

Cal. Water Code § 4999, *et seq.* ...........................................................................1 2

Proclamation No. 48, 27 Stat. 168, 1069 No. 48 (Feb. 25, 1893) ........................ 3

**Other Authorities**

Cal. State Water Res. & Control Bd., *First Notice of Extraction and Diversion of
    Water*,
    https://www.waterboards.ca.gov/waterrights/publications_forms/forms
    /docs/gw_first_notice.pdf ...............................................................................12

US Drought Minitor,
    *https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?West* ...................16

**INTRODUCTION**

The right to the water at Arrowhead Springs in Strawberry Canyon was the most important consideration in the Forest Service's deliberations.  The Forest Service knew that BlueTriton claims appropriative water rights predating the creation of the San Bernardino National Forest (SBNF).  But the Forest Service demanded information during the permit renewal process as if *it* had full proprietary right to all the water at Arrowhead Springs.  Such a claim would be extraordinary, because even if BlueTriton had not appropriated the water before the creation of the SBNF in 1893, the federal Government's claim to that water under California law could extend only to that portion of unappropriated water necessary to meet the needs of the United States as overlying landowner.  And in the decades BlueTriton and its predecessors have collected water from Arrowhead Springs, the Forest Service has never defined or established the needs of the SBNF in the vicinity of Strawberry Canyon or showed that it could not meet those needs.

So, in 2024, how did the Forest Service suddenly purport to claim the right to assess how third parties use the water BlueTriton collected after it is piped out of the forest to the same delivery points BlueTriton and its predecessors have used for decades?  And how could the Forest Service ban BlueTriton's use of Arrowhead Springs given BlueTriton's claim of appropriative rights and collection of water under those rights for more than a century?  Before this Court, the Forest Service concedes the materiality of these questions, which should have been answered in the agency's decision document.  "But if there is an explanation, it does not appear" there.  *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024).  The Notice of Denial contains no answers—much less rational ones—to these questions and is thus arbitrary and capricious.

1

Instead, the Forest Service proffers post hoc rationalizations for its decision. The most important reason, the agency claims, is that the California State Water Resources Control Board (the "State Board") concluded that BlueTriton does not hold the rights that the company claims. The Notice of Denial does not mention anywhere the State Board's conclusion or discuss its bearing on the Forest Service's decision. More importantly, the State Board's order has been stayed, making any reliance on it, at best, premature. Beyond that, the State Board order only precluded some, not all, of BlueTriton's collections from Arrowhead Springs. So even if the State Board's decision is eventually upheld in full, BlueTriton still retains the rights to some of the water the Forest Service has now cut off.

The Forest Service has failed to address these problems, either in its issued decision or its post hoc rationalizations. Instead, the agency asks this Court to uphold the denial of BlueTriton's permit by relying on the legal conclusion of a State Board decision that a California court has stayed until judicial review is complete. And yet it is the Forest Service that now (without irony) accuses BlueTriton of collaterally attacking that state-law process. The Forest Service's insistent reliance on the State Board's decision only underscores the centrality of the water-rights question under State law and the need for the California courts to complete their work.

BlueTriton is not asking this Court to intercede in any aspect of that state-law process. It instead asks the Court to evaluate whether the Forest Service followed the requirements of the Administrative Procedure Act (APA). The record clearly shows the Forest Service did not. The Forest Service did not explain how it resolved the questions of BlueTriton's water rights or the agency's authority to control the water in Strawberry Canyon. The reasons recited in its Notice of Denial—each of which is premised on the answers to those

2

threshold questions—are not supported by the record before the agency. And the answers it provided after the fact do not withstand scrutiny.

Absent an injunction, the Forest Service will succeed in short-circuiting the State process and imposing substantial unrecoverable costs on BlueTriton. The Court should grant BlueTriton's motion.

## I.    BlueTriton Is Likely to Prove that the Notice of Denial Violates the APA.

### A.    The Forest Service's Reliance on the State Board's Order is Post-Hoc Rationalization for the Notice of Denial.

In its opening brief, BlueTriton recounted its long history of appropriative use at Arrowhead Springs in Strawberry Canyon, none of which the Forest Service disputes. *See* ECF 2-1 ("Br.") at 2-11. Those rights predated the federal Government's reservation of the SBNF in 1893, which reserved water rights only for "*unappropriated* water" that would be "superior to the rights of *future* appropriators." *Cappaert v. United States*, 426 U.S. 128, 138 (1976) (emphasis added); *see* Proclamation No. 48, 27 Stat. 168, 1069 (Feb. 25, 1893) (excepting preexisting rights from the reservation of SBNF). And any claim to then-unappropriated water rights only applied to the water necessary to achieve the 1893 purpose of the reservation. *Cappaert*, 426 U.S. at 139. BlueTriton's preexisting water rights, "recognized and acknowledged by the local customs, laws, and the decisions of courts," were not upset by that reservation. 43 U.S.C. § 661.

The Notice of Denial says nothing about the history of BlueTriton's water rights in Strawberry Canyon. Instead, it addresses BlueTriton as though the company were a stranger whose ability to access water hinged on the good graces of the federal Government rather than as of right under California law. That is the only way to explain the Forest Service's asserted entitlement to impose conditions and reporting requirements on how and

where water collected in Strawberry Canyon could be used after it is piped through the SBNF.  It reflects the Forest Service's mistaken unfounded and pre-decision assertion that "[t]he groundwater rights remain with the United States and are used permissively."[1]

The Forest Service does not have the power to determine BlueTriton's water rights. Nor is it qualified to do so.  Instead, as its briefing makes clear, the Forest Service stakes its argument to the September 2023 decision from the State Board.  The Forest Service devotes half of its argument to hail that decision as dispositive of BlueTriton's rights and to assail the company's contrary assertions as a "collateral attack" on a state-law process.  The Forest Service makes no secret of why the State Board's order is so important to the Notice of Denial:  that order is "[t]he reason" the Forest Service "no longer views BlueTriton as having an appropriative right to the water at Strawberry Canyon."  ECF 15 ("Opp.") at 27.

Yet the State Board's order is never mentioned in the Notice of Denial.  "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).  What matters are the Forest Service's stated reasons in the Notice of Denial, not the post-hoc rationalizations offered by counsel once that decision is challenged. *See id.*  Because the Notice of Denial says nothing about the State Board's decision, the Forest Service cannot invoke it now to shore up its decision to deny BlueTriton's permit.

### B.    The Forest Service's Invocation of the State Board's Order Fails to Address Important Aspects of the Problem.

Even if the Court could read counsel's post-hoc reliance on the State Board's decision into the Notice of Denial, that reliance is arbitrary and capricious because it fails to

---

[1] Ex. 19, Letter from District Ranger Michael Nobles to Louis Mixon (May 24, 2024), at 1.

address at least three "important aspect[s] of the problem." *Ohio*, 144 S. Ct. at 2053 (citing *State Farm*, 463 U.S. at 43) (internal quotation marks omitted).

>            1.      **The State Board's judicially stayed order has no legal effect on Blue-Triton's historical appropriative rights in Strawberry Canyon.**

As the Forest Service grudgingly acknowledges in a passing footnote, *see* Opp. at 14 n.5, a Fresno County Superior Court stayed the State Board's decision six months before the Notice of Denial issued.[2]  Even so, the agency inexplicably claims that the stayed order commands "preclusive effect unless California courts reverse."  Opp. at 22.  It ought to go without saying, but the effect of the California court's order was to "stay the operation of the administrative order or decision pending the judgment of the court."  Cal. Civ. Proc. Code § 1094.5(g).  As a result, there is no legal basis to give the State Board's decision any weight.  To the contrary, the stay puts BlueTriton, and any party that might purport to interfere with the company's rights—including the Forest Service—at the status quo ante.[3]

The Forest Service's flaw is nearly identical to that of EPA in *Ohio v. EPA*.  In that case, EPA proposed to promulgate a federal implementation plan (FIP) under the Clean Air Act to cover 23 States whose state implementation plans (SIPs) had been disapproved.  144 S. Ct. at 2049.  Before EPA could issue the FIP, however, several courts of appeals stayed the SIP disapprovals, meaning EPA could not impose the FIP on those States.  *Id.* at 2051.

---

[2] *See* ECF 15-22 (Feb. 7, 2024 Order Granting Motion for Stay by Superior Court of California for Fresno County).

[3] In the footnote, the Forest Service criticizes the suggestion that the stay "casts doubt on the vitality of the State Board's analysis," because the applicable state procedural rule does not require the findings a federal court might make when granting a stay.  *See* Opp. at 14 n.5.  BlueTriton remains confident it will prevail in reversing the State Board's order, but it did not ask this Court to presage that outcome based on the entry of the stay.  The point is that, because of the stay, the State Board's order "has no effect today."  Br. at 18.  The Forest Service says nothing in response.

EPA nevertheless went forward with the FIP, which had been premised on the assumption that all 23 States would be covered. *See id.* at 2053. The Supreme Court granted a motion to stay the FIP by concluding EPA likely violated the APA's arbitrary-and-capricious standard when it "ignored 'an important aspect of the problem' before it"—the change to the premise underlying its action. *Id.* at 2054 (quoting *State Farm*, 463 U.S. at 43).

The Notice of Denial evinces the same arbitrary and capricious obstinacy. Its critical premise—what the Forest Service admits is "[t]he reason" it can ignore BlueTriton's decades of appropriative use under California law, Opp. at 27—comes from a State agency action that has been judicially stayed. And just as EPA did not explain how it could impose the FIP when so many States' SIP disapprovals had been stayed, *Ohio*, 144 S. Ct. at 2054, the Forest Service, whether in the Notice of Denial or in its briefing to this Court, never accounts for the California court's stay of the State Board's order.

The Forest Service's failure to address the legal ineffectiveness of the State Board's order undermines its bluster that BlueTriton is mounting a "collateral attack" on that process. To be sure, BlueTriton disputes the State Board's conclusion (particularly as to the spring sites at which it would have restricted BlueTriton's collections) and expects to be vindicated through judicial review in California's courts. But BlueTriton does not ask this Court to issue a ruling that would supersede or overtake that process. BlueTriton instead asks the Court to enjoin a federal action that frustrates (and fails to address or account for) that process. By treating the State Board order as if it has full force and effect when a State court has said it should have none, the Forest Service purports to nullify ongoing judicial review of the State Board's order. If the Forest Service can prevent BlueTriton from accessing its water, judicial vacatur of the State Board's order is no remedy at all. If anything, it is the

Forest Service that asks this Court to intrude upon California's judicial review by rubberstamping a Notice of Denial predicated on an inchoate state-law process to which the Forest Service is a mere bystander.

Of course, the Forest Service's invocation of abstention and preclusion doctrines only reinforces why the State Board's order is essential to the Forest Service's action here. Yet the Forest Service says nary a word about the State Board's conclusions in the Notice of Denial.  Its counsel cannot supply those missing words now.

### 2. The State Board's order does not cover the full scope of BlueTriton's appropriative rights in Strawberry Canyon.

Even if the State Board's order weren't stayed, it could not bear the weight the Forest Service gives it because the order does not extend to every water source covered by the Notice of Denial.  This too is an important aspect of the problem ignored by the Forest Service.

BlueTriton has collected and transmitted water from a dozen sources in Strawberry Canyon.  Over the years, the company's special use permits have identified these sources by number and letter:  Tunnels 2 and 3; and Boreholes 1, 1A, 7, 7A, 7B, 7C, 8, 10, 11, and 12.[4] The Notice of Denial required BlueTriton to cease its pipeline operations at these locations "by severing or blocking the pipe at *each* tunnel or borehole."[5]

But the State Board's order did not go that far.  Indeed, the State Board expressly acknowledged that its order "does not prohibit BlueTriton from continuing to divert water through its Boreholes 10, 11 and 12 for its water-bottling operations or deliveries to the San

---

[4] *See, e.g.*, Ex. 9 ("This permit [is] issued for the purpose of: Operating and maintaining a water collection and transmission system that consists of tunnels #2 and 3, horizontal wells 1, 1A, 7, 7A, 7B, 7C, 8, 10, 11, 12 and their associated vaults, connected through 4.5 miles of 4" pipeline.").  A map showing the approximate locations of the ten bore holes in Strawberry Springs is attached as Figure 7 to the State Board's order.  ECF 15-6 at 136.

[5] *See* Ex. 22, Notice of Denial, at 2 (emphasis added).

Manuel Band."[6]  According to the State Board, the historical record for those locations was "conflicting."[7]  The investigative authorities also failed to "allege that BlueTriton's diversions through Boreholes 10, 11 and 12 were unauthorized diversions," because they could not be sure those sources were "subject to the permitting authority of the State Water Board."[8]  So the State Board declined to include those sources in its order, and instead required BlueTriton to make monthly reports regarding its "daily diversions, deliveries and discharges" from Boreholes 10, 11, and 12.[9]  As a result, the State Board rendered no decision on BlueTriton's water rights at those springs, lacked sufficient evidence to decide its own jurisdiction over those sites, and recognized that BlueTriton could continue to divert water at those sites.

The Forest Service describes the State Board's exclusion of Boreholes 10, 11, and 12 as based on "due process concerns," Opp. at 6 n.3, but the agency made no attempt to explain why those same boreholes appear in the Notice of Denial.  That leaves many questions and no answers:  How does the Forest Service account for BlueTriton's claim to water from those sources?  Does the Forest Service consider its rights at those sources to be superior to BlueTriton's?  Does the Forest Service rely on some legal basis other than the State Board's decision to prohibit BlueTriton's right of access at those sources?  The Forest

---

[6] ECF 15-6 at 6.  Boreholes 10, 11, and 12 are downstream from the other sources identified by the State Board and the Forest Service and the closest to BlueTriton's loading station.  *See id.* at 136 (Figure 7 to State Board order).
[7] *Id.* at 69, 86.
[8] *Id.* at 87.
[9] *Id.* at 92.

Service's failure to account for these issues renders the Notice of Denial arbitrary and capricious.[10]

### 3. The State Board's order is premised on a conclusion the Forest Service does not endorse.

The Forest Service's reliance on the State Board's decision is further misplaced because the decision relies on a conclusion (that Arrowhead Springs qualifies as *surface* water) that the Forest Service disputes.[11]  To be sure, BlueTriton agrees that the subject water is groundwater.  But the Forest Service does not reconcile that its characterization of Arrowhead Springs as groundwater puts that water beyond the State Board's authority.  *See N. Gualala Water Co. v. State Water Res. Control Bd.*, 139 Cal. App. 4th 1577 (2006).  The Forest Service's failure to explain why it relies on a determination that hinges on a conclusion the agency disputes is further proof of the arbitrary and capricious nature of its action here.

### C. The Forest Service's Issuance of the Notice of Denial Based on BlueTriton's Purported "Refusal" to Provide Information was Arbitrary and Capricious.

After devoting a dozen pages to the State Board's order, the Forest Service turns to its stated "reason for denial":  BlueTriton's supposed "refus[al] to provide materials

---

[10] *Amicus* cites *County of Okanogan v. National Marine Fisheries Service*, 347 F.3d 1081 (9th Cir. 2003), for the sweeping proposition that the Forest Service can impose restrictions in special use permits that eliminate private-party water rights.  But the facts in that case are different in key respects.  For one, unlike BlueTriton, the private parties claiming water rights there first diverted water *after* the federal reservation of the forest and only pursuant to permits that expressly reserved the Government's right to terminate the right of way.  *Id.* at 1082.  Here, of course, BlueTriton claims rights that predate the SBNF and thus must be protected under 43 U.S.C. § 661, a statute cited nowhere in *County of Okanogan*.  Moreover, in that case the Forest Service only imposed flow restrictions after completing an environmental analysis that identified the need to maintain certain stream flows to protected endangered species.  *Id.* at 1084.  Here, the Forest Service has eliminated BlueTriton's access to its water based on the dubious and conclusory assertion that the information submitted by the company was insufficient to allow the agency to conduct *any* analysis.

[11] *E.g.*, Ex. 17, Letter from District Ranger Michael Nobles to Louis Mixon (Apr. 24, 2024); Opp. at 23 (claiming "groundwater rights as an overlaying landowner").

necessary to demonstrate compliance with the previous permit's terms." Opp. at 27. This justification is arbitrary, capricious, and unsupported by law.

### 1. The Notice of Denial does not explain the Forest Service's authority to restrict off-Forest appropriative use of water.

As explained above, the Forest Service's entire line of inquiry was premised on the faulty notion that BlueTriton lacks appropriative rights in Strawberry Canyon. More than that, its stated reasons for denial make sense only if the Forest Service is claiming a superior right to the water. To be sure, the Forest Service could seek information and impose "reasonable restrictions" to protect the Forest property used for BlueTriton's right of way to access to Arrowhead Springs. *Adams v. United States*, 3 F.3d 1254, 1260 (9th Cir. 1993). But the Forest Service's questions did not focus on the right of way, including the 4" pipeline that has traversed a small corner of the SBNF for decades. Instead, they seek information about how and where the water is used after it leaves the metes and bounds of the Forest.

The Notice of Denial offers no rationale for this asserted right-to-know. In its briefing to this Court, the Forest Service claims both "riparian rights to Strawberry Creek" and "groundwater rights as an overlaying landowner." Opp. at 23. "But," the agency explains, "the Forest Service did not deny BlueTriton's application for those reasons." *Id.* That averment does not pass muster. More importantly, it dooms the Notice of Denial. If the Forest Service does not rest its authority to police the off-Forest use of water collected from Arrowhead Springs on its own water rights, then what authorizes it to reject a permit based on insufficient information about that use?

More troubling, the Forest Service makes a shockingly broad assertion of authority to require preapproval of "any change" to the "beneficial use of water or location of use of

water" from the pipeline. *See* Opp. at 25. Thus, the Forest Service claims an entitlement

not simply to *know* but also to *approve* how the San Manuel Band uses water on its property.

The Forest Service identifies no source for such sweeping authority. Nor does it define any limit that would restrict its application to situations plainly beyond the agency's remit. For example, if the data the Forest Service sought existed and BlueTriton had provided it, could the agency still veto the permit if it disagreed with how the Tribe puts the water to beneficial use? Would the Forest Service expect BlueTriton to be the broker between the San Manuel Band and the federal Government to negotiate modifications and then police the Tribe's use? And how far down BlueTriton's own supply chain could the Forest Service reach? If the company sent a truck from the loading station in the SBNF to a new facility distribution center outside the SBNF, must the Forest Service preapprove that "change in location of use?" If so, where in the Forest Service's authorizing laws and regulations might it look to guide its decisions on how a private company should distribute its products?

As absurd as these questions might seem, they all percolate from the same source: the Forest Service's claimed right to control the flow of water from Arrowhead Springs. But so long as the State Board's order is stayed, BlueTriton has preexisting water rights. And even if the Forest Service had the full set of rights of an overlying landowner to unappropriated water, those rights end when the needs of the overlying landowner are met.[12] The Notice of Denial does not grapple with any of these critical aspects of the problem, and thus renders the agency action arbitrary and capricious. *See Ohio*, 144 S. Ct. at 2053.

---

[12] And even then, the agency should know what its needs are before purporting to claim they haven't been met. *See infra* I.C.3.

### 2. The Notice of Denial runs counter to the record reflecting BlueTriton's detailed submissions to the Forest Service.

As a factual matter, the Forest Service's stated "reason" is not supported by the record. Although BlueTriton did not accede to the Forest Service's asserted right-to-know, the company used its best efforts to deliver the information requested. During the past decade, BlueTriton delivered nearly 70 project submissions to the Forest Service, and it redelivered those reports during the agency's review of the application.[13] These project submissions included historical annual water collection and use-report information, which are submitted to the State Board and describe BlueTriton's operations at Arrowhead Springs, as required by the State Board's Groundwater Recordation Program. *See* Cal. Water Code § 4999, *et seq.* BlueTriton and its predecessors have filed these annual reports since at least 1947, and they describe the volumes of water collected at each source for the prior calendar year and the beneficial use to be made of the water.[14]

In its 2023 order, the State Board required BlueTriton to provide far more detailed water collection and use information in monthly reports. These reports included the daily amounts delivered to the San Manuel Band and noted the company's understanding that such water was beneficially used for municipal, irrigation, and recreation and environmental habitat uses. BlueTriton provided copies of those monthly reports to the Forest Service while the order remained in effect and has continued to do so even after the California court

---

[13] *See* Ex. 20, Letter from Louis Mixon to District Ranger Michael Nobles (June 4, 2024), at 1.

[14] *See, e.g.*, Cal. State Water Res. & Control Bd., *First Notice of Extraction and Diversion of Water*, https://www.waterboards.ca.gov/waterrights/publications_forms/forms/docs/gw_first_notice.pdf.

stayed the order that mandated them.[15]  Thus, BlueTriton not only has provided the Forest Service all the information required by State regulators; it has gone above and beyond to the Forest Service even though it has no duty to provide them to the State Board.

And that's not all.  Even though BlueTriton explained that it lacked access to the granular information the agency sought, the company worked with the San Manuel Band to describe the Tribe's water use at the Arrowhead Springs Hotel property.[16]  The San Manuel Band explained that it uses the water delivered "for a variety of beneficial and reasonable purposes as has occurred historically."[17]  The property's facilities, which include "a conference and event center, administration buildings, and recreational and cultural facilities," are used daily "by tribal citizens, various governmental departments and their employees that are housed in the administrative buildings, and for events."[18]  The San Manuel Band also explained that it conducts "fire management activities" at the property, including "the development and implementation of fire protection plans that include the property and rely upon the use of water."[19]  The San Manuel Band also made clear that "the Tribe would be glad to speak further with the USFS on a government-to-government basis."[20]

In short, BlueTriton responded to every question posed by the Forest Service, provided all the data required by State regulators, and obtained information from the San

---

[15] *See* Ex. 16, Letter from Louis Mixon to District Ranger Michael Nobles (Apr. 23, 2024), at 2.

[16] *See, e.g.*, Ex. 18, Letter from Louis Mixon to District Ranger Michael Nobles (May 14, 2024), at Exhibit C ("Supplemental Information Submitted by SMBMI to USFS"); Ex. 20, Letter from Louis Mixon to District Ranger Michael Nobles (June 4, 2024), at Exhibit A ("Additional Information Submitted by SMBMI to USFS").

[17] Ex. 20, Letter from Louis Mixon to District Ranger Michael Nobles (June 4, 2024), at Exhibit A.

[18] *Id.*

[19] *Id.*

[20] *Id.*

Manuel Tribe.[21]  Nevertheless, the Forest Service made "unimpeachably clear" that it must

know (and authorize) what happens after water leaves the pipeline and enters the sovereign

property of the San Manuel Band.[22]  In response, BlueTriton reiterated that "the more spe-

cific volume and use data requested by the USFS (for the first time in over 90 years of per-

mit history) *simply does not exist*."[23]  BlueTriton was unaware of any metering equipment at

the property "that would be able to generate the data requested."[24]  Perhaps the Tribe could

install such equipment, but the company could not force it to do so, much less require the

Tribe "to provide the information generated" by that equipment.[25]  BlueTriton offered that it

would "continue to work with" the San Manuel Band on these issues, but the information

sought by the Forest Service would be "unlikely to be available anytime soon."[26]

The Forest Service mischaracterizes BlueTriton's repeated and earnest responses to

the agency's queries as "refusing to provide information."  Opp. at 26.  But the company

never "unreasonably refused" to answer the Forest Service's questions.  *Id.* at 25.  To the

contrary, the record shows that BlueTriton provided extensive information, including

---

[21] *See* Ex. 16, Letter from Louis Mixon to District Ranger Michael Nobles (April 23, 2024) (3-page written response); Ex. 18, Letter from Louis Mixon to District Ranger Michael Nobles (May 14, 2024) (18-page submission of written answers, data, reports, and reports); Ex. 20, Letter from Louis Mixon to District Ranger Michael Nobles (June 4, 2024) (35-page submission of written answers, plans, and historical records); ECF 15-20, Letter from Louis Mixon to District Ranger Michael Nobles (July 1, 2024) (57-page submission of written answers, data, and plans).
[22] Ex. 21, Letter from District Ranger Michael Nobles to Louis Mixon (June 21, 2024), at 2.
[23] ECF 15-20, Letter from Louis Mixon to District Ranger Michael Nobles (July 1, 2024), at 2 (emphasis added).
[24] *Id.*
[25] *Id.*
[26] *Id.*

reports of historic annual and recent daily volumes of water, and the San Manuel Band's explanation for its use at the Hotel property.

At bottom, the informational deficit here lies with the Notice of Denial, not BlueTriton.  The Notice does not explain how, despite receiving all the information BlueTriton provided to the State Board, the Forest Service could not assure itself that the company was "in compliance with California law."[27]  Nor does the Notice address the company's unchallenged assertion that data the Forest Service sought "simply does not exist."[28]  And even if the Forest Service could justify its demand for such extremely detailed information, the Notice of Denial elides the fact that such information would have to come from the San Manuel Band and not BlueTriton.

Thus, the Forest Service's conclusion that BlueTriton failed to provide enough information not only glosses over "an important aspect of the problem," but also "runs counter to the evidence before the agency."  *State Farm.*, 463 U.S. at 43.  The Notice of Denial is therefore arbitrary and capricious.

### 3.  The Notice of Denial fails to explain why it lacked sufficient information to ensure compliance with the Land Management Plan.

The Notice of Denial asserts that "BlueTriton's application materials are insufficient to demonstrate compliance with the current Land Management Plan."[29]  As articulated by the Forest Service, such compliance "requires minimizing impacts to ground aquifers and

---

[27] Ex. 22, Notice of Denial, at 2.  To the extent the Forest Service conceived that "compliance with California law" meant adhering to the State Board's 2023 order, the agency ignored that the judicial stay rendered the order without effect in February 2024.

[28] ECF 15-20, Letter from Louis Mixon to District Ranger Michael Nobles (July 1, 2024), at 2.

[29] Ex. 22, Notice of Denial, at 2.

disallows 'surface water diversions and groundwater extractions' unless 'the water extracted is excess to the current and reasonably foreseeable future needs of the forest.'"[30]

As BlueTriton has noted, the Notice of Denial "never explains its calculation of the amount of water needed to meet the needs of SBNF or where the purported needs of the SBNF are not being met, and thus fails to show deliberation or transparency."  Br. at 22.[31] The Forest Service gives the sophistic response that it didn't need to articulate the "needs of the forest" because the company "failed to provide information that would allow the Forest Service to reach a conclusion those issues" other than to "rely on stale data."  Opp. at 24.

The Forest Service's explanation makes no sense.  Whatever the "needs of the forest" are, they exist independent of any information provided by BlueTriton.  How else could the agency conclude that the amount diverted "is *excess* to the current and reasonably foreseeable future needs of forest resources?"[32]  The Forest Service declined to rely on its previous determinations of those questions, because "conditions in Strawberry Canyon have significantly changed since our last evaluation in 2018."[33]  But what are the needs of the Forest?  The Forest Service does not say, nor does it identify limiting principles that will guide how it answers that question.  Whatever those precise needs are, did the needs of the Forest change since 2018?  Was the data provided by the applicant in 2018 (and 2022 and 2023)

---

[30] Opp. at 24 (quoting Ex. 22, Notice of Denial, at 1-2) (brackets omitted).

[31] The Forest Service's conclusion regarding the "needs of the forest" is likewise "contrary to the substantial agency before the agency" based on record evidence showing that "BlueTriton's collection has no effect on stream flows or other conditions in Strawberry Creek, and does not reduce flow from the Forest Service's groundwater collection sites just outside of Strawberry Canyon."  Br. at 22-23.

[32] Ex. 22, Notice of Denial, at 2.

[33] Ex. 22, Notice of Denial, at 2. That claim is highly dubious as well.  California's long drought is now over.  *See https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?West*.  If anything, hydrological conditions within the SBNF have improved since 2018.

qualitatively different from the data provided in 2024?  Has the Forest Service concluded that it cannot support forest resources with the water sources available to it?[34]  The decision document answers none of these questions and provides no indication that the Forest Service meaningfully grappled with them.

4.      **The Notice of Denial does not explain the Forest Service's about-face on BlueTriton's decades-old beneficial uses.**

The Forest Service chastises BlueTriton for allegedly exceeding the purposes authorized by the previous special use permit by diverting water to the historical Arrowhead Springs Hotel property.  As explained above, this contested rationale for denying BlueTriton's permit application aggrandizes to the Forest Service a never-before-claimed authority to control the water collected in Strawberry Canyon well after it leaves the SBNF.  Worse yet, that "unauthorized purpose" rationale is neither supported by the factual record nor consistent with the Forest Service's prior positions.

First, the "authorization" argument forwarded by the Forest Service does not withstand glancing scrutiny.  The agency says that BlueTriton needed to obtain the official approval of "any change in a water facility, including a change in the ownership or beneficial use of water or location of use of water from a water facility that is not *expressly Authorized in this permit*."[35]  But nowhere in the permit does the Forest Service define any beneficial use that it was "expressly" authorizing.  Instead, the permit authorizes exactly what the Forest Service has the power to regulate:  BlueTriton's ability "to use or occupy National Forest System lands in the San Bernardino National Forest … for the purpose of [o]perating and

---

[34] *But see supra* n.31.
[35] Opp. at 25 (quoting ECF 15-4 at 14).

maintaining a water collection as well as transmission system."[36]  If the permit intended to limit the specific uses of the collected water after it leaves the SBNF, it would have said so specifically.  The Forest Service cannot rely on (at best) ambiguous language it drafted to impose such a restriction now.  *See United States v. Seckinger*, 397 U.S. 203, 210 (1970) (applying the "general maxim that a contract should be construed most strongly against the drafter, which in this case was the United States").

To attempt to cure this deficiency, the Forest Service points to the 2018 Decision Memo, which identifies the "project purpose … to supply bottled drinking water for retail sale."[37]  But the Decision Memo does not purport to dictate how BlueTriton may exercise its appropriative rights after it has transported the water through the pipeline.  Instead, consistent with decades of prior practice, the Decision Memo explains that the agency is simply "respond[ing] to a request to *authorize the continued occupancy and use* of the existing water development facilities, water transmission pipelines, [etc.]."[38]

What's more, the Forest Service has known about the diversions to the Arrowhead Springs Hotel property for years.  BlueTriton and its predecessors have always delivered water to the owners of that property by contract, with the first recorded agreement between their respective predecessors recorded in San Bernardino County in 1930.[39]  Beyond that record notice, BlueTriton informed the Forest Service in 2016 that, with the San Manuel Band's acquisition of the Hotel property, "the Tribe has rights to a certain portion of the

---

[36] ECF 15-4 at 1.
[37] Ex. 11, 2018 Decision Memo, at 1.
[38] *Id.* (emphasis added).
[39] Ex. 18, Letter from Louis Mixon to District Ranger Michael Nobles (May 14, 2024), at 2.

spring water which currently flows through the Arrowhead Springs Pipeline."[40]  The Forest Service thus had knowledge of exactly the beneficial use it now complains of when it issued the 2018 special use permit, which did not purport to identify any particular beneficial uses. The agency is therefore not simply wrong that diversion to the Hotel property violates the terms of BlueTriton's permit; it has arbitrarily and capriciously done an about-face on the significance of that diversion to its permitting decisions from 2018 to 2024, with no explanation whatsoever.  *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (noting that when an agency changes position, "it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account'") (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)).

> **5.    The Forest Service's ouster of BlueTriton from its right of way exceeds any authority to impose reasonable regulations on access to the water.**

Finally, the Notice of Denial imposes a series of drastic consequences for the decades-old right of way BlueTriton has used to access its water.  In the immediate term, the Forest Service has commanded the company to halt all use of the pipeline and either remove all locks or provide the Forest Service with keys to those locks.[41]  Those steps are prelude to the greater requirement that BlueTriton prepare "to remove its infrastructure from SNBF lands," including all pipes and scaffolding installed within the last 50 years, valves, valve cages, support structures, electronic monitoring and power equipment, and any

---

[40] Ex. 18, Letter from Louis Mixon to District Ranger Michael Nobles (May 14, 2024), at Exhibit B, Letter from Larry Lawrence to District Ranger Christine A. Hill (July 13, 2016).

[41] Ex. 22, Notice of Denial, at 2.

discharge, bypass or hydropower equipment.[42]  In short, the Notice of Denial requires Blue-Triton to begin the process of removing the pipeline it has used for decades.

Even if the Forest Service could condition its permit on the provision of the information it claims it needs, imposing the drastic consequence of removing the pipeline goes too far.  BlueTriton's preexisting water rights—which are unchallenged as to at least Boreholes 10, 11, and 12—include a vested right of way to access the water, subject to "*reasonable* regulations." *Adams*, 3 F.3d at 1260  (emphasis added).  The Forest Service cannot impose a regulation on BlueTriton that "prohibits [BlueTriton] from exercising [its] vested rights" or "limits [its] exercise of those rights so severely as to amount to a prohibition." *Elko Cnty. Bd. of Sup'rs v. Glickman*, 909 F. Supp. 759, 764 (D. Nev. 1995) (explaining the "reasonable regulation" of a right of way protected under 43 U.S.C. § 661).

The special use permits issued by the Forest Service over the years contained various requirements that fit within the realm of "reasonable" restrictions on BlueTriton's (and its predecessors in interest) use of Forest Service land to access Arrowhead Springs.  For example, all construction plans must be prepared by a "qualified professional based on federal employment standards acceptable to the authorized officer" and should receive "written approval from the authorized officer before they are implemented."[43]  The permit further requires compliance with various federal laws governing environmental protection, the discovery of antiquities, the protection of Native American graves and relics, endangered species, and so on.[44]  As a general matter, a special use permit ought to be a compendium of

---

[42] *Id.*
[43] Ex. 9, 2018 Special Use Permit § II.B.
[44] *See id.* § V.A-I.

"reasonable regulations" to the extent it does not limit the vested right of access "so severely as to amount to a prohibition." *Elko Cnty. Bd. of Sup'rs*, 909 F. Supp. at 764.

The Notice of Denial does the opposite.  By setting into motion the process through which BlueTriton will be ousted from its only method to access its vested water rights, the Forest Service's response is *per se* unreasonable.  The Notice of Denial presumes the lawfulness of that conclusion without acknowledging that BlueTriton's water rights preclude that drastic solution.  As a result, the agency action is both "not in accordance with law," 5 U.S.C. § 706, and "fail[s] to consider an important aspect of the problem," *State Farm*, 462 U.S. at 43.

## II.   BlueTriton Faces Irreparable Harm Absent an Injunction.

The Forest Service's action will cause BlueTriton irreparable harm.  The Notice of Denial bars BlueTriton from accessing or using *any* of its spring sources (including the three spring sources unaffected by the State Board's stayed order) and requires BlueTriton to submit a plan for removal of its infrastructure with no reason to believe a removal order would not follow right after that.  To downplay these harms, the Forest Service minimizes and mischaracterizes its own Notice of Denial and BlueTriton's business.

First, the Forest Service says that removal of the pipeline infrastructure is not "imminent," and the consequences are not extreme.  This downplays the agency's order and defies reality.  The Notice of Denial cuts off—immediately and indefinitely—BlueTriton's access to the spring waters that it and its predecessors have relied on for more than a century.  Indeed, Arrowhead Springs is the eponymous source for one of BlueTriton's popular brands.  Under the Notice of Denial, BlueTriton must submit by October 18, 2024, a decommissioning plan to remove spring water infrastructure in place for nearly a century.  Under these

circumstances, claiming that BlueTriton is not facing "new" hardships and that the Forest Service is merely requiring BlueTriton "to submit a plan" is disingenuous at best.  Indeed, the Forest Service stops well short of asserting that it will accept a decommissioning plan that leaves critical infrastructure in place while this case remains pending.  Moreover, absent an injunction, it will be impossible for the company to meet its decades-old water delivery contractual obligations with the Tribe.  This harm to BlueTriton is unprecedented and a direct result of the Forest Service's Notice of Denial.

The Forest Service's argument also overstates the standard for irreparable harm. The Court must consider whether, "in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The Notice of Denial's deadlines will lapse before this case concludes on the merits.  Indeed, BlueTriton has already begun to experience harm by having its access to its water rights eliminated.

The Forest Service's course of conduct in recent months demonstrates, rather than diminishes, the irreparable harm faced by BlueTriton absent an injunction.  The agency tries to assuage the Court that the start of work to remove BlueTriton's infrastructure "is months away at least."  Opp. at 30.  Yet absent a preliminary injunction, the Forest Service could approve a decommissioning plan the day after it is submitted.  Indeed, even if the exact start dates for the removal of infrastructure or its future replacement are "murky," the Forest Service does not dispute that the removal may start before a final decision by this Court.

Second, the Forest Service points to BlueTriton's response to the State Board's order as proof that the harm caused by the Notice of Denial is not irreparable.  That argument ignores the fact that the State Board's decision (even before it was stayed) allowed continued

22

collections at three of BlueTriton's spring sources and did not restrict BlueTriton's access to its infrastructure.  The Forest Service does not dispute that BlueTriton will suffer some economic and business harm from severing access to its spring sites and does not suggest that it will reimburse or repair any of those harms should BlueTriton succeed on the merits.

Moreover, the Forest Service's suppositions about how the company should respond to the Notice of Denial presume that the agency knows more about BlueTriton's business than the company does.  And the agency is wrong that BlueTriton must face financial ruin to show financial harm is irreparable.  BlueTriton faces economic harm "above and beyond a simple diminution in profits."  *Air Trans. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012).  That harm cannot be recovered from the federal Government.  *See, e.g.*, *Robertson v. Cartinhour*, 429 Fed. App'x 1, 3 (D.C. Cir. 2011) ("Although the general rule has it that economic harm does not constitute an irreparable injury, the rule is based upon the presumption that adequate compensatory or other corrective relief will be available at a later date ...." (internal citations omitted)).   The Forest Service's imaginative assertions that the costs and delays of restarting a spring water collection system after a lengthy shutdown are "ordinary" or could be offset by "94 years" of past revenue are contradicted by the only expert before the Court on this issue.[45]

## III.   The Balance of Equities and the Public Interest Favor Issuing BlueTriton's Requested Preliminary Injunction.

BlueTriton emphasized in its opening brief that the Forest Service articulated no exigency that would justify shuttling the company out of the right of way it has used for nearly a century.  *See* Br. at 23-27.  In its opposition, the Forest Service still does not explain why

---

[45] *See* Ex. 1, Mixon Decl., at ¶¶ 23-25.

maintaining the status quo ante—one that is consistent with the pipeline's operation under agency-issued permits for *decades*—would be untenable.  As for what the agency argues, none of it explains why the balance of equities and public interest favor establishing a new set of conditions that has never existed in the SBNF.

The Forest Service leads with the argument that "there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  Opp. at 35 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  BlueTriton wholeheartedly agrees—which is why the public interest favors the issuance of the injunction.  *See League of Women Voters*, 838 F.3d at 12 (issuing a preliminary injunction because "[t]here is generally no public interest in the perpetuation of unlawful agency action").  The agency's argument to the contrary presumes the lawfulness of the Notice of Denial.  But as recounted in detail above and in BlueTriton's opening brief, the denial of the special use permit application violated the APA in several ways.  On that basis, BlueTriton's "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest."  *Id.*

The Forest Service next argues that forestalling the Notice of Denial will cause negative environmental impacts in the Forest and surrounding communities.  But the agency is not seeking to "restore" conditions in the SBNF.  Because the collection of water from Arrowhead Springs predates the reservation of the SBNF, the Forest Service's vision of "restored flows" is the creation of a set of circumstances that has never existed.  Of course, if the Forest Service believes that the collection of water at Arrowhead Springs risks a specific environmental harm, it did not say so in the Notice of Denial.  Opinions offered in expert declarations prepared for this litigation are just more post-hoc rationalization.  In all events,

the Forest Service cannot show how the public interest is served by changing the conditions the public has experienced for as long as the SBNF has existed.

BlueTriton also explained that the public interest is served by making sure that sufficient water is delivered to the San Manuel Band. Br. at 27. The Forest Service swipes back that the Tribe's harm "is not BlueTriton's to assert." Opp. at 37. That defensive argument is as perplexing as it is wrong. Even when the third and fourth injunction factors merge, "courts consider the impacts of the injunction on nonparties as well." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 114 (D.D.C. 2020). The Forest Service received information during the permitting process that the Tribe uses water delivered by BlueTriton for "fire management activities" and "the development and implementation of fire protection plans that include the property and rely upon the use of water."[46] And to the extent the Forest Service insists the Tribe requires *no* water from BlueTriton's pipeline to meet those needs, that assertion is belied by the agency's modification of the Notice of Denial "to allow continued deliveries of water from certain sources *to the San Manuel Band for fire safety*" until September 2, 2024.[47]

The public interest and balance of equities favor granting the requested injunction to maintain the status quo until this case concludes.

## CONCLUSION

For the reasons above, and those given in BlueTriton's opening brief, the Court should preliminarily enjoin the Forest Service's Notice of Denial.

---

[46] Ex. 20, Letter from Louis Mixon to District Ranger Michael Nobles (June 4, 2024), at Exhibit A.

[47] Opp. at 21 (citing ECF 15-21, Letter from Forest Supervisor Danelle Harrison to Louis Mixon (Aug. 2, 2024) ("Because the Tribe has proclaimed that the waters are necessary for fire safety and ongoing activities at the property, I expect that any water deliveries will be limited to those purposes.").

Dated:  August 20, 2024

Respectfully submitted,

*/s/ George P. Sibley, III*
George P. Sibley, III (D.C. Bar No.
1011939)
Kevin S. Elliker (D.C. Bar No. 90011101)
(D.D.C. admission pending)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
gsibley@HuntonAK.com
kelliker@HuntonAK.com


Andrew J. Turner (D.C. Bar No. 471179)
Todd S. Mikolop (D.C. Bar No. 1030859)
(D.D.C. admission pending)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037-1701
(202) 955-1500
aturner@huntonAK.com
tmikolop@HuntonAK.com

*Counsel for Plaintiff BlueTriton Brands, Inc.*